UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

JOSE RAMOS,
                             05 CV 0023 (ARR)

              Petitioner,

                             <u>NOT FOR</u>
                             <u>ELECTRONIC OR PRINT</u>
   -against-                       <u>PUBLICATION</u>

WILLIAM PHILLIPS, Superintendent,       <u>OPINION AND ORDER</u>
Green Haven Correctional Facility,

              Respondent.

-------------------------------------------------------------------- X

ROSS, United States District Judge:

By petition dated December 20, 2004, petitioner pro se, Jose Ramos, seeks a writ of habeas corpus under 28 U.S.C. § 2254. In his petition, Ramos alleges six grounds for habeas relief: (1) the evidence was not sufficient to prove his guilt beyond a reasonable doubt and his conviction was against the weight of the evidence; (2) his sentence was excessive; (3) trial counsel was ineffective because he failed to argue that the evidence of first-degree murder was legally insufficient; (4) trial counsel was ineffective because he failed to object to the court's jury charge on first-degree murder; (5) trial counsel was ineffective because his behavior caused the court to chastise him repeatedly before the jury; (6) trial counsel was ineffective because he failed to request a missing witness charge; and (7) the prosecutor committed misconduct throughout the trial. For the reasons stated below, Ramos's petition is denied.

1

## BACKGROUND

Following a trial in January 2001, a jury convicted petitioner of one count of Murder in

the First Degree and one count of Robbery in the First Degree. The state court sentenced

petitioner, a predicate felony offender, to concurrent prison terms of life without parole on the

murder count and twelve and one-half to twenty-five years on the robbery count. Petitioner

appealed to the Appellate Division, which affirmed petitioner's conviction on December

29,2003. People v. Ramos, 2 A.D.3d 883, 769 N.Y.S.2d 739 (2d Dep't 2003). The court found

defendant's legal sufficiency of the evidence claim unpreserved for appellate review. The court

found all of defendant's claims to be without merit. The Court of Appeals subsequently denied

his application for leave to appeal, People v. Ramos, 2 N.Y.3d 745, 778 N.Y.S.2d 470 (2004).

The body of John Krontiris was found by his daughter, Anastasia "Stacy" Lipari, shortly

after midnight on July 2, 1997, in his workshop, at the home he shared with his family, 1104 62nd

Street, Brooklyn, New York . R. 329, 331, 336.[1] Krontiris had left the Poconos, where he was

spending time with his family at their vacation home, bound for Brooklyn, at 6:30 a.m. on June

30, 1997. R. 504, 522. Krontiris left messages on Stacy's answering machine and subsequently

spoke with Anna Asamanis, a friend, sometime between 8:30am and 9:00am. R. 611. Despite

trying to contact him numerous times, nobody was able to get in touch with Krontiris throughout

the remainder of June 30th. Friends and family also tried, unsuccessfully, to contact Krontiris

throughout the day on July 1st. Stacy Lipari found the body shortly after midnight on July 2nd.

According to police officers, Krontiris had suffered injuries to the head and face and was

bleeding from the back of the head. R. 548. An autopsy of the body revealed that the cause of

---

[1]"R." indicates citation to the administrative record.

death was blunt impact to the head and neck with fracture of the skull, subdural and subarachnoid hemorrhage. R. 930, 932. The time of death was no later than 10:00 a.m. on June 30, 1997. R. 927-32. Krontiris kept several thousand dollars in $100 bills and food stamps locked in the top-drawer of a desk located in an office inside his workshop. R. 337-39, 351-52, 381, 392. Upon investigation of the crime scene, Detective Edward Wallace found that the drawer had been pried open. R. 100.

Petitioner worked for Krontiris for a number of years in the 1980s and 1990s. R. 332-33, 498-99, 807-08. On June 23, 1997, petitioner was released from prison. R. 177, 297-300, 782, 785. Miriam Sostre, petitioner's girlfriend, testified that on the day of his release petitioner had approximately three dollars in his pocket.[2] R. 190, 205. Sostre did not see petitioner again until June 29, 1997. On June 24, 1997, petitioner called John Krontiris in search of work, but was told by his wife, Sophia, that Krontiris was in Greece; he was expected to return the next day. R. 499-503. Mrs. Krontiris suggested petitioner call back on June 26, 1997. R. 500.

On July 1, 1997, petitioner met Sostre on the street. R. 185. Sostre noticed that petitioner had fresh scratch marks on his neck. R. 187. Upon inquiry by Sostre, petitioner claimed that three men had assaulted him at a train station. R. 188. Not believing him, Sostre asked petitioner if he had killed Krontiris, R. 188-89, to which petitioner replied, "I did it, and so what." R. 189, 191. When petitioner walked away, leaving a black bag that he had with him near Sostre, Sostre opened the bag. She saw surgical gloves, a hammer a bloody napkin, a lot of money, a set of keys, and food stamps. R. 189-91.

---

[2]Petitioner told detectives that he had $38.00 when released from prison. R. 782, 785

On July 3, 1997, Detectives Turno and Niemczyk interviewed petitioner at the 68th precinct in Brooklyn. See R. 399-461, 632-643, 731. He was not a suspect at the time, but the detectives believed he may have been one of the last persons to see Krontiris alive, as petitioner had an appointment to meet with Krontiris on June 30, 1997. R. 399, 403, 454, 457. At this interview, petitioner stated that he met with Krontiris at his home on June 28, 1997, seeking work; although no work was available, Krontiris loaned him $50. R. 404. At Krontiris's direction, petitioner met him again at 8:00 a.m. on June 30, 1997. R. 404-05. Petitioner said they had coffee together and that he had told Krontiris he could not work that day because he needed to find an apartment. R. 404-05. Defendant stated that he had left the workshop at approximately 8:30 a.m. to meet Sostre in Manhattan to search for an apartment. R. 405. Petitioner stated that he and Sostre had rented an apartment in Brooklyn on July 1, 1997, paying the broker's fee, security deposit, and first month's rent with cash borrowed from two friends and his brother, Pedro Ramos. R. 407, 482-84. In an attempt to verify petitioner's statement that he borrowed money from his brother, the officers arranged a phone call between petitioner and his brother. R. 410, 448, 488. On this call, petitioner's brother indicated that he never loaned petitioner any money. R. 489.

On July 5, 1997, petitioner's daughter, Janet Ramos, looked into a closet in her apartment used exclusively by her father, finding a shopping bag containing a large quantity of food stamps. R. 678. Upon inquiry, petitioner refused to tell her their origin, stating that it was none of her business. R. 679-80. Also on July 5, 1997, Petitioner and Sostre purchased one-way airline tickets to Puerto Rico. Petitioner paid for the tickets with new $100 bills. R. 192-93, 434-35. Petitioner and Sostre flew to Puerto Rico on July 6, 1997. R. 192, 194. Sostre testified that, on

4

at least five occasions while in Puerto Rico, petitioner told her that he killed "Mr. Johnny." R. 199-200, 275-76, 280-21.

In August 1997, Detectives Niemczyk and Miguel Hernandez interviewed Marisol Rodriguez Martinez, Sostre's mother, in Puerto Rico. Martinez told Det. Hernandez that petitioner had made a drug run to the Mexican border in return for $7,000. R. 594. Petitioner and Sostre returned to New York after staying four to six weeks in Puerto Rico. R. 196, 277-78.

In July 1998, petitioner met Marisol Santiago, with whom he subsequently had a relationship for nine months. R. 762-63. According to Santiago, petitioner told her on one occasion that he had killed someone and had taken some money, food stamps, and gold. R. 763-65, 767-68.

Petitioner was interviewed by detectives on August 26, 1999. R. 773-757, 779, 794, 799. Petitioner acknowledged and waived his <u>Miranda</u> rights. R. 774-79. At this time, petitioner denied having left prison with a black bag, R. 785, denied taking money from Krontiris, R. 782, denied having keys and food stamps in a bag when he met Sostre in the park, R. 787, and denied leaving food stamps at Janet Ramos's house, R. 787. He stated that he learned of Krontiris's murder from the detectives who had interviewed him on July 3, R. 782, 787.

## DISCUSSION

1.    <u>Standard of Review</u>

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The phrase "clearly established Federal law" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court "(1) arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or (2) decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413. A decision is deemed an "unreasonable application" of clearly established Supreme Court law if a state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Id. "Under the latter standard, 'a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Gilchrist v. O'Keefe, 260 F.3d 87, 93 (2d Cir. 2001) (quoting Williams, 529 U.S. at 411). The Second Circuit has added, however, that although "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Frances S. v. Stone, 221 F.3d 100, 111 (2000) (internal quotation marks and citations omitted). Under AEDPA, a federal court must

6

defer to the state court's findings of fact, which are "presumed to be correct." 28 U.S.C. §

2254(e). "The applicant shall have the burden of rebutting the presumption of correctness by

clear and convincing evidence." Id.

2.    Procedural Bar

Federal courts may not review state court decisions that rest on an adequate and

independent state procedural default unless petitioner can show both cause and prejudice or a

fundamental miscarriage of justice. Fama v. Commissioner of Correctional Services, 235 F.3d

804, 809 (2d Cir. 2000) (citing Coleman v. Thompson, 501 U.S. 722, 749-50 (1991); Harris v.

Reed, 489 U.S. 255, 262 (1989)). In order for federal review to be procedurally barred, the state

court's reliance on state law must be "clear from the face of the opinion." Id. (internal quotation

marks and citation omitted). The Second Circuit held in Fama that where the state court uses

language such as "the defendant's remaining contentions are either unpreserved for appellate

review or without merit" the claim is subject to federal review. Id. at 810-11. The court's

decision in Fama did not overturn prior rulings, however, that a state court decision constitutes a

procedural default where the court stated that a claim was "not preserved for appellate review"

before ruling "in any event" on the merits. Id. at 810n.4.

3.    Petitioner's Legal Insufficiency Claim

Petitioner claims that the evidence was legally insufficient to support his murder

conviction. At trial, defendant failed to raise a legal insufficiency claim as required by the

contemporaneous objection rule under New York law. The Appellate Division, relying on that

independent and state procedural grounds, found the claim unpreserved for appellate review.

People v. Ramos, 2 S.D.3d 883, 769 N.Y.S.2d 739, 739-40 (2d Dep't 2003) ("The defendant's

contention that the evidence was legally insufficient to establish his guilt is unpreserved for appellate review."). Because the Appellate Division based its decision on an independent and adequate state procedural ground, and because petitioner has not asserted any cause for his procedural default or prejudice resulting therefrom, petitioner's legal insufficiency claim is precluded from habeas review.

In any event, petitioner's legal insufficiency claim is without merit. Petitioner claims that the evidence of first-degree murder was legally insufficient because it did not establish that he had formed the intent to rob John Krotiris before he killed him. Petitioners challenging the sufficiency of the evidence face a "very heavy burden." Knapp v. Leonardo, 46 F.3d 170, 178 (2d Cir. 1995). On federal habeas review, courts must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). The court must defer to the jury's "assessments of the weight of the evidence and the credibility of witnesses." Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996). A court may only grant habeas relief if the petitioner has shown that, "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324 (emphasis added).

There was ample evidence in the record permitting the jury to convict Ramos of Murder in the First Degree under New York Penal Law § 125.27(1)(a)(vii). Under that statute, a person is guilty of murder in the first degree "when[,] [w]ith intent to cause the death of another person, he causes the death of such person . . . and . . . the victim was killed while the defendant was in the course of committing . . . and in furtherance of robbery . . . ." In the instant case, there was

8

sufficient evidence to allow a reasonable juror to find that defendant intentionally killed John Krontiris in the course of and in furtherance of a robbery. The evidence showed that petitioner arrived at the Krontiris's home at or around 8:00 a.m. or 8:30 a.m. on June 30. R. 404-05, 782, 786. Krontiris was killed no later than 10:00 a.m. that day. R. 927-32. Evidence also showed that soon after the event, petitioner, formerly broke and unemployed, see R. 190, 404, 782, had a large quantity of food stamps and thousands of dollars in $100 bills, see R. 407, 482-84, 192-93, 434-35. Before his death, Krontiris kept several thousand dollars in $100 bills and food stamps locked in the top-drawer of a desk located in an office inside his workshop. R. 337-39, 351-52, 381, 392. In fact, days before Krontiris's death, petitioner had contacted Krontiris seeking work, and borrowed $50 from him. R. 404. When Krontiris's body was found, the locked desk drawer in which Krontiris kept his money and food stamps had been pried open. R. 100. There was also evidence that petitioner was involved in a physical struggle around the time Krontiris was beaten to death. R. 188. In addition, Miriam Sostre testified that defendant confessed to her on numerous occasions that he had killed Krontiris, R. 189, 278, and that she had seen surgical gloves, a hammer, and a bloody napkin in petitioner's bag the day after the killing. R. 189-91. Similarly, Marisol Santiago testified that petitioner had told her that he had killed someone and had taken some money, food stamps, and gold. R. 763-65, 767-68. In fact, in his brief before the Appellate Division, and again in his traverse in connection with this habeas petition, petitioner conceded that the evidence established that he intentionally killed Krontiris. Ex. C at 28, 39; Traverse at 5.

As he did on appeal, petitioner argues only that the government failed to prove that he formed the intent to rob the victim before he killed him, a necessary element, he alleges, to

9

convict under New York Penal Law § 125.27(1)(a)(vii). The cases relied on by appellate counsel, however, pertain to New York Penal Law § 125.25, the second degree murder statute, a statute distinct from the one at issue here. In response, the government stated on appeal that "[t]here is a substantial undecided question as to whether a conviction of first-degree murder under Penal Law § 125.27(1)(a)(vii) requires proof that defendant formed the intent to commit the felony prior to the commission of the homicidal act." Ex. D. at 38, n.18. The government concluded that policy militated against presuming such a requirement. Id. at 39.

Even assuming, arguendo, that such proof is required, the jury could reasonably have concluded that petitioner did form the intent to rob Krontiris before killing him. The evidence established that petitioner needed money, since he had between $3.00 and $38.00 when released from prison and was seeking work. See R. 190, 205, 782, 785. There was no evidence that petitioner had a known reason to kill the victim. Accordingly, a reasonable juror could have concluded from the evidence in the record that petitioner visited Krontiris with the intention of stealing money and subsequently decided to kill him. A "federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir. 1994) (quoting Jackson v. Virginia, 443 U.S. 326). Although other inferences may have been drawn from the evidence – e.g. that petitioner only robbed the victim as an afterthought – the jury could reasonably have concluded from the evidence that petitioner, "[w]ith intent to" kill Krontiris, killed him "while [he] was in the course of committing and in furtherance of robbery." New York Penal Law § 125.27(1)(a)(vii).

To the extent that petitioner also contends that the "jury verdict convicting petitioner of Robbery in the Second Degree was against the weight of the evidence" (Pet. Ground Three), such a claim is not cognizable before this court. Unlike the legal sufficiency argument discussed above, which is based on federal due process principles, "[a] 'weight of the evidence' argument is a pure state law claim . . . ." Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) (citing Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). Federal habeas corpus relief does not lie for mere errors of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Therefore, the court is precluded from considering on federal habeas review the petitioner's claim that the jury verdict was "against the weight of the evidence."

Having considered the evidence in the light most favorable to the prosecution, the court cannot conclude that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. Accordingly, habeas relief is not warranted on this claim.

4.    Petitioner's Excessive Sentence Claim

Petitioner's next ground for a writ is that the sentences imposed for his first degree robbery and first degree murder convictions were excessive. "It is well-settled that an excessive sentence claim under the Eighth Amendment is not cognizable on habeas review where the sentence imposed complies with state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992). A federal court cannot consider the merits of a claim raised in a habeas corpus petition unless the petitioner establishes that he is held in custody in violation of the federal Constitution or other federal law. See 28 U.S.C. § 2254(a). Absent a challenge to a state statutory sentencing scheme, there is no federal constitutional issue presented where a state sentence is within the

11

range proscribed by state law. See, e.g., White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992);

Calderon v. Artuz, 2001 WL 135741, at *6 (E.D.N.Y. Jan. 31, 2001).

5.      Petitioner's Ineffective Assistance of Counsel Claims

Before enactment of AEDPA, federal habeas courts reviewed all ineffective assistance

claims de novo. As noted above, however, AEDPA amended the law to mandate deference to

state court decisions that adjudicated a petitioner's claim on the merits. 28 U.S.C. § 2254(d).

Also as noted above, a state court decision is an "adjudication on the merits" requiring

application of the deferential AEDPA standard of review even when it does not explicitly refer to

the federal claim or discuss the reasoning for its decision, as long as it finally resolves a party's

claims and is based on the substance of the claim advanced, rather than on a procedural ground.

Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001).

Under AEDPA, a state habeas petitioner claiming ineffective assistance of counsel must

show that the state court "applied Strickland to the facts of his case in an objectively

unreasonable manner." Bell v. Cone, 535 U.S. 685, 698-99 (2002); Aparicio v. Artuz, 269 F.3d

78, 99 (2d Cir. 2001) ("Under AEDPA we inquire only whether the Appellate Division's

rejection of this claim amounted to an unreasonable application of Strickland."). Strickland v.

Washington requires a petitioner claiming ineffective assistance to prove both that counsel's

representation "fell below an objective standard of reasonableness" measured under "prevailing

professional norms" and that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668,

688, 694 (1984).

a.      Counsel failed to argue legal insufficiency of first-degree murder evidence

12

Petitioner first argues that he was denied effective assistance of trial counsel because his attorney failed to argue that the evidence supporting first-degree murder was legally insufficient. This claim is without merit. The decision by defense counsel not to make this argument was a matter of strategy. "Strategic choices of trial counsel 'are virtually unchallengeable' in habeas corpus proceedings." Bonneau v. Scully, 1991 U.S. Dist. LEXIS 7150 (S.D.N.Y. 1991) (citation omitted), aff'd without op., 956 F.2d 1160 (2d Cir. 1992).

Throughout trial, defense counsel sought to prove that petitioner had not robbed or killed John Krontiris. To this end, defense counsel aggressively cross-examined prosecution witnesses attempting to impeach their testimony and show bias, sought to demonstrate that the police investigation had been sloppy and the results were unreliable, and attacked police interrogation methods in an effort to show that defendant's statements to police were involuntary. In addition, counsel suggested other possible suspects, other sources of defendant's cash, and an alternative cause and time of death. Each of these strategies was consistent with defendant's alleged innocence.

By contrast, the argument now advocated by petitioner – that although petitioner did kill Krontiris, he only robbed him as an afterthought – would have conflicted with, and undermined, the defense of factual innocence, and may have confused the jury. Trial counsel's strategic decision not to make the argument proposed by petitioner was reasonable and did not constitute ineffective assistance of counsel. See United States v. Vegas, 27 F.3d 773, 777-78 (2d Cir.) (because counsel's strategy was a reasonable one, the decision to pursue one defense rather than another was not ineffective assistance of counsel), cert. denied, 513 U.S. 911 (1994); Gatto v. Hoke, 809 F.Supp. 1030, 1039 (E.D.N.Y.) ("[a]n attorney who presents a well-grounded, but

ultimately unsuccessful defense, will not later be held to have provided ineffective assistance of counsel."), aff'd without op., 986 F.2d 500 (2d Cir. 1992). Petitioner has not rebutted the strong presumption that counsel's representation fell within the range of reasonableness as measured under "prevailing professional norms." Accordingly, the state court reasonably concluded that trial counsel's failure to argue insufficiency of the evidence did not constitute ineffective assistance of counsel. The state court's conclusion constitutes a reasonable application of clearly established federal law.

     *b.*     *Counsel's behavior caused the court to chastise him before the jury*

Petitioner next alleges that defense counsel behaved unprofessionally during the trial and that his behavior and resulting reprimands deprived defendant of effective assistance of counsel. Defense counsel's overall behavior at trial, however, was sufficiently professional. The trial court admonished defense counsel before the jury for minor transgressions only. See R. 173, 186-89, 311-12. All stronger warnings by the trial court were administered outside the presence of the jury. See R. 211-14, 364-71, 949-57. In any event, there is no indication in the record that defense counsel's behavior prevented defendant from receiving a fair trial. See United States v. DiPaolo, 804 F.2d 225, 234 (2d Cir. 1986) (that counsel was criticized at times by the court does not show that representation was defective).

     *c.*     *Counsel failed to request a missing witness charge*

Petitioner next argues that he was denied effective assistance of trial counsel because his lawyer failed to requests a missing witness charge for Detective Hernandez. This claim is also meritless. Defense counsel could not have shown that he was entitled under New York State law to have the court deliver such a charge. The failure to request a charge that one is not entitled to

14

cannot "fall below an objective standard of reasonableness." Accordingly, defense counsel's failure to request a missing witness charge - a charge he was not entitled to - did not constitute ineffective assistance.

To warrant a missing witness charge under New York law, the party requesting the charge must show that (1) the uncalled witness is knowledgeable about a material issue upon which evidence is already in the case, (2) the witness would naturally be expected to provide non-cumulative testimony favorable to the party who has not called him, and (3) the witness is available to such party. People v. Gonzalez, 68 N.Y.2d 424, 427 (1986). Petitioner did not show that Detective Hernandez was knowledgeable about a material issue in the case, and he was therefore not entitled to a missing witness charge.

Detective Hernandez interviewed Marisol Rodriguez Martinez, Sostre's mother, in Puerto Rico. R. 432-33, 594. According to Martinez's testimony, at the interview she told the detective that petitioner was paid $7,000 for a drug run to the Mexican Border. R. 594. Petitioner argued before the Appellate Division that Detective Hernandez, had he been called as a witness, could have testified that petitioner had received $7,000 not from robbing Krontiris but from an alternative source, namely as payment for a drug run to the Mexican border. Ex. F. at 3. Testimony by the detective about Martinez's statement to him would have been precluded as hearsay. Thus, the detective could have testified to the alternative source only if he had independent knowledge. Petitioner speculated that he "possibly might have conducted further investigation into the authenticity of [Ms. Martinez's] allegation." Id. There is no evidence in the record, however, that Detective Hernandez ever made such an investigation. Accordingly,

petitioner did not establish that Detective Hernandez was knowledgeable about a material issue in the case, and he was not entitled to a missing witness charge.

In any event, it cannot be said that defendant would have obtained a greater benefit had the jury been permitted to consider the adverse inference contained in the missing witness charge. Defense counsel highlighted the absence of the detective in his summation, claiming that the prosecution did not call Detective Hernandez to testify because his testimony would have been damaging to their case. R. 996. Because defense counsel was permitted to use the absence of Detective Hernandez to argue to the jury, defendant was not prejudiced by the lack of a missing witness charge. Further, during summation, defense counsel used the testimony of Marisol Martinez concerning her interview with Detective Hernandez to argue that the source of petitioner's money was not John Krontiris, but rather the drug run to Mexico. R. 1006-10, 1025, 1033. Thus, contrary to petitioner's assertion, the jury was aware of petitioner's alternative explanation of the money's origins.

> d. *Counsel's failure to object to the court's jury charge on first-degree murder*

Finally, petitioner contends that counsel's failure to object to the court's allegedly deficient charge to the jury on first-degree murder constituted ineffective assistance of counsel. Pet. Reply at 6. Specifically, petitioner complains that the charge did not make it clear that the jury was required to find that appellant formulated the intent to steal property before killing the victim. However, the court's charge on first-degree murder was correct. As discussed above, under New York Penal Law § 125.27(1)(a)(vii), the jury was required to find that petitioner murdered Krontiris "in the course of" and "in furtherance of" a robbery. The jury reasonably concluded that petitioner had done just that. The failure to object to jury instructions that are

legally correct as given does not constitute ineffective assistance of counsel. See, e.g., Aparicio v. Artuz, 269 F.3d 78, 99-100 (2d Cir. 2001); Briecke v. People, 936 F.Supp. 78, 83-84 (E.D.N.Y. 1996).

Petitioner's appellate counsel argued that New York Penal Law § 125.27 required proof that petitioner formed the intent to commit robbery before killing the victim. The cases relied on by appellate counsel, however, pertain to New York Penal Law § 125.25, the felony murder statute, which differs from the statute at issue because it does not require intent to kill. In response, the government argued on appeal that "[t]here is a substantial undecided question as to whether a conviction of first-degree murder under Penal Law § 125.27(1)(a)(vii) requires proof that defendant formed the intent to commit the felony prior to the commission fo the homicidal act." Ex. D. at 38, n.18. Defendant concluded that policy militated against presuming such a requirement. Id. at 39.

Petitioner has pointed the court to no case law requiring a charging court to instruct the jury that § 125.27(1)(a)(vii) requires proof that petitioner formed the intent to commit the felony prior to committing the homicide. The state court found petitioner's ineffective assistance claim meritless. This court cannot deem the state court's finding to be an "objectively unreasonable" application of Strickland. Petitioner did not establish that the failure to object to the charge "fell below an objective standard of reasonableness" measured under "prevailing professional norms" because petitioner did not establish that such a charge was warranted. In fact, because there is no evidence that the charge was improper under state law, it was reasonable for defense counsel not to object to it.

6.    Petitioner's Prosecutorial Misconduct Claim

Finally, petitioner makes numerous claims of prosecutorial misconduct. To prevail on a claim of prosecutorial misconduct, petitioner must show more than mere trial error. Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998). "It is not enough that the prosecutor's remarks were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 181 (1986). The prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642-43 (1974)). The three factors to be considered in determining whether a prosecutor's actions create the "substantial prejudice" necessary to render a trial fundamentally unfair are: (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct; and (3) the certainty of conviction absent the improper statements. Tankleff, 135 F.3d at 252.

Although petitioner does not indicate specific improper conduct by the prosecutor in his habeas petition, he made 11 allegations of prosecutorial misconduct in his in brief before the Appellate Division. The court assumes that petitioner sought to advance these same claims in his habeas petition. As discussed below, each of petitioner's prosecutorial misconduct claims lacks merit.

First, petitioner alleges the prosecutor improperly advised Detective Luis Hernandez to delay an interview with defendant until a pending criminal case against defendant was over and defendant was no longer represented by counsel. Ex. F at 11. At a hearing on September 25, 2000, Detective Hernandez testified on cross-examination that the District Attorney had advised him to delay an interview with defendant until defendant had been sentenced in a pending

18

criminal case, so that defendant would no longer be represented by counsel. H. Tr. of Sept. 25, 2000 at 22-26. Even accepting this as true, petitioner's right to counsel was not implicated by the prosecutor's delay. Petitioner had the right and opportunity to demand legal counsel and was told of such right upon the reading of his <u>Miranda</u> rights. The prosecutor had no obligation to interview petitioner before his unrelated case had reached a final disposition.

Second, petitioner claims that Detective Hernandez failed to inform petitioner that he was a suspect when he informed him of his <u>Miranda</u> rights before an August 1999 interview. Ex. F. at 11. Misconduct by Detective Hernandez cannot be imputed to the prosecutor. In any event, Detective Hernandez was not required to inform defendant that he was a suspect. He was required to inform petitioner only of his constitutional rights. Upon being advised of his constitutional rights, petitioner knowingly and voluntarily waived them before talking to the detective. Petitioner did not suffer any prejudice as a result of Detective Hernandez's actions.

Third, and relatedly, petitioner claims that he was prejudiced by Detective Hernandez's failure to document his interview with petitioner in a "DD-5." While Detective Hernandez testified that he did, indeed, fail to prepare a DD-5, this is, at most, a violation of police department procedures for which defendant lacks standing to complain. In any event, his failure to prepare the form in no way compromised petitioner's right to a fair trial.

Fourth, petitioner alleges that the prosecutor "knowingly, purposely and repeatedly attempted, over strenuous defense objection, to inflame the jury by disclosing to them that defendant was previously accused of domestic violence, solely to show defendant's predisposition to violence." Ex. F. at 12. The prosecutor asked Miriam Sostre why she had decided to break off her relationship with defendant. R. 305-06. Upon an objection by defense

counsel, the court directed the prosecutor to ask only innocuously phrased questions that did not refer to domestic violence. R. 307-09. Although the prosecutor complied with this directive, when defense counsel moved to strike one of Sostre's answers, the witness exclaimed that defendant used to "hit [her]" and "beat [her] up." R. 312. The court struck Sostre's exclamation and directed the jury to disregard it. Id. The prosecutor's question – which fell within the bounds of the court's instructions – did not constitute prosecutorial misconduct.

In any event, the court's instruction to the jury cured any potential prejudice. The jury is presumed to adhere to the curative instructions of the trial court unless "there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions" and a strong likelihood that the effect of the evidence would be "devastating" to the defense. Greer v. Miller, 483 U.S. 756, 766n.8 (quoting Richardson v. Marsh, 481 U.S. 200, 208 (1987) and Bruton v. United States, 391 U.S. 123, 136 (1968)). This is not such a case.

Fifth, petitioner alleges that the prosecutor employed overaggressive tactics. Ex. F. at 13. This claim is based in part on the prosecutor's examination of Stacy Lipari, which, petitioner alleges, was "clearly styled to inflame the jury's emotion in favor of the deceased's daughter." Id. After carefully reviewing the transcript, the court sees nothing improper in the prosecutor's examination of Stacy Lipari. Defense counsel made no objection during the examination and the court did not admonish the prosecutor at that time.

Petitioner's claim that the prosecutor employed overaggressive tactics is also based in part on the prosecutor's alleged attack on defense counsel during the redirect examination of

Sophia Krontiris.[3] Ex. F. at 13. The court can find no such attack in the record. In any event, in light of the strong evidence against petitioner, the court concludes that the outcome of the trial was unaffected by any minor misconduct during the examination of either Ms. Lipari or Mrs. Krontiris. Tankleff, 135 F.3d at 252. Accordingly, petitioner suffered no prejudice as a result of the prosecutor's conduct, and habeas relief on this basis is unwarranted.

Sixth, petitioner alleges that the prosecutor circumvented the rules of evidence to elicit hearsay testimony from Anna Asamanis. Ex. F. at 13. Upon defense counsel's objection during the witness's testimony, the court correctly overruled the objection, stating on the record that "[t]he reference to the conversation is received not for the truth of what was said by Mr. Krontiris but for the fact of the utterance." R. 613. The testimony elicited by the prosecutor was thus proper under New York evidence law, and the prosecutor's conduct was proper.

Seventh, petitioner alleges that the prosecutor failed to turn over documents in a timely matter, in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963).[4] Ex. F. at 13-14. "When a habeas petition is based on belated disclosure of Brady material, rather than non-disclosure of such information, a petitioner is not entitled to reversal, even if the information is deemed material, 'unless he can show that the delayed disclosure caused him prejudice.'" Lyon v.

---

[3]Respondent interprets plaintiff's prosecutorial misconduct claim due to "overaggressive tactics" to be based in part on the prosecutor's refusal to enter into a stipulation concerning physical evidence and photographs. The court does not see such a claim in petitioner's brief before the Appellate Division. Nonetheless, the court notes that the prosecutor was under no obligation to enter into a stipulation with defense counsel, and his refusal therefore cannot constitute misconduct.

[4]Although petitioner actually alleges a violation of People v. Rosario, 92 N.Y.2d 286, which, as a violation of state law, is not cognizable on habeas review, because of his pro se status, the court interprets his challenge under Brady.

Senkowski, 109 F. Supp.2d 125, 138 (W.D.N.Y. 2000) (quoting U.S. v. Diaz, 922 F.2d 998, 1007 (2d Cir. 1990), cert. denied, 500 U.S. 925 (1991)). Evidence is material for Brady purposes only if, had the evidence been disclosed, the result of the proceeding would have been different. U.S. v. Bagley, 473 U.S. 667, 682 (1985).

Petitioner alleges he was prejudiced both when the prosecutor turned over thirteen pages of evidence directly before the testimony of Parol Officer Manuelita Clemente and when he turned over petitioner's parole file in the middle of P.O. Clemente's testimony. See R. 645-652. There is no evidence in the record that these documents did, in fact, constitute Brady material, i.e. evidence favorable to the defense or impeachment material. In any event, assuming, arguendo, that the documents constituted Brady material, petitioner has not established that he was sufficiently prejudiced by this material that the prosecutor's untimely production of these reports resulted in a Brady violation.

Although defense counsel requested a twenty-minute break in order to review the thirteen pages turned over before P.O. Clemente's testimony, the court did not rule on defense counsel's request, but defense counsel did not renew it and did not request any further remedy. Furthermore, with regard to the thirteen pages, although defense counsel began his examination of P.O. Clemente in the morning on the day the documents were received, her examination was continued in the afternoon after an extended lunch break. Accordingly, defense counsel had ample time to digest the thirteen pages of material. With respect to the more voluminous parole file, defense counsel requested, and was granted, a recess to review the documents. R. 734.

Eighth, petitioner alleges that the prosecutor coached a witness. Ex. F. at 14. Defense counsel requested a sidebar during his cross-examination of Parole Officer Manuelita Clemente,

because the prosecutor "nodd[ed] his head up and down profusely" when the witness said something of which the prosecutor allegedly approved. See R. 705. The prosecutor denied the allegation. R. 706. The court was unable to "affirm or disaffirm" the allegation, but admonished both attorneys to "avoid anything that could be construed as communication with a witness." Id. These facts do not establish that the prosecutor committed prosecutorial misconduct by coaching Officer Clemente. In any event, there is no evidence that any such misconduct resulted in prejudice to the petitioner.

Ninth, petitioner alleges that the prosecutor became an unsworn witness by describing a bag seized from petitioner's locker at the Wards Island Men's Shelter. Ex. F. at 14. During his examination of Detective Timothy O'Brien, defense counsel asked to see, in the presence of the jury, "something" that was opened by Detective O'Brien and put aside at the prosecutor's instruction. R. 849. The court identified the items as "some kind of material, cloth," prompting the prosecutor's response that "[i]t was a laundry bag recovered from the defendant's locker . . . at Wards Island." Id. The court directed Detective O'Brien to put the items aside. Id. Upon defense counsel's later objection that the prosecutor had become an unsworn witness concerning the items, R. 897, the court offered to instruct the jury to disregard the prosecutor's comments and subsequently did so.

These facts to not make out a claim of prosecutorial misconduct. The prosecutor did not intend that the jury see the items, and the jury saw them only at defense counsel's request. The court attempted to identify the objects for the record, to which the prosecutor logically responded. The prosecutor clearly did not intend to give unsworn testimony regarding the items. In any event, petitioner suffered no prejudice because any error was cured by the court's

23

instruction to the jury that the items and the prosecutor's comments concerning them were not in evidence and should be disregarded. R. 905-06.

Tenth, petitioner alleges that the prosecutor's "feigned attempt" to assist in the production of Detective Miguel Hernandez constituted prosecutorial misconduct. Ex. F. at 14-15. The prosecutor had no legal obligation to help the defense secure the presence of Detective Hernandez. Further, there is no indication in the record that the prosecutor's efforts to locate and produce Detective Hernandez were insincere.

Finally, petitioner alleges that the prosecutor made a "direct and personal appeal to an impaneled juror." Id. at 15. The prosecutor opened his summation by addressing one of the jurors personally, asking, "Ms. Weems, you went to law school, right?" R. 1035. At the request of defense counsel, the court issued a curative instruction, explaining that it was improper for attorneys to address individual jurors during summation. R. 1038. The court's curative instruction cured any error and eliminated any possible prejudice.

## CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is denied. Because Ramos has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2) (1996), no certificate of appealability will be granted. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

_____
Allyne R. Ross
United States District Judge

Dated: June 27, 2005
      Brooklyn, New York

SERVICE LIST:

*Pro Se Petitioner*
Jose Ramos, #01A2047
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582-0010

*Attorney for the Respondent*
Howard Goodman
Assistant District Attorney
Kings County District Attorney's Office
350 Jay Street
Brooklyn, NY 11201